FILED IN CHAMBERS
U.S.D.C. - Atlanta

MAR 1 0 2017

James N. Hatten, Clerk
By: _____ Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

NOVELIS CORPORATION,

          Plaintiff

v.

CHRIS SMITH,

          Defendant


CHRIS SMITH,

          Counter Claimant

v.

NOVELIS CORPORATION,

          Counter Defendant

CIVIL ACTION NO.
1:16-CV-1557-ODE

## ORDER

This civil case for declaratory judgment, breach of contract, and misappropriation of trade secrets comes before the Court on Plaintiff Novelis' Motion for Preliminary Injunction [Doc. 13]. For the reasons discussed below, Novelis' Motion for Preliminary Injunction [Doc. 13] is GRANTED IN PART, and DENIED IN PART.

### I. **Procedural Background**

On May 13, 2016 Novelis filed suit against former Novelis employee Smith who left Novelis in April 2016, and now works for Ma'aden Aluminum Company (hereinafter "Ma'aden") in Saudi Arabia [Doc. 1]. On June 20, 2016 Novelis filed an Amended Complaint [Doc. 16]. In its Amended Complaint, Novelis alleged four causes of action: (1) declaratory judgment that Novelis did not owe Smith remaining payments under a Retention Incentive Agreement and that

Smith had to refund to Novelis a payment made under a Long Term Incentive Plan [id. at 16-17, 3]; (2) breach of contract for violation of various covenants in a Non-Compete Agreement [id. at 17-18]; (3) misappropriation and/or threatened disclosure of trade secrets [id. at 18-19]; and (4) attorneys' fees under Georgia law [id. at 20-21]. Novelis sought to have the Court preliminarily and permanently enjoin Smith as a result of his alleged breach and misappropriation [Id. at 22-24]. Smith counterclaimed against Novelis for 1) breach of contract for failure to make a payment under the Annual Incentive Plan, and 2) attorneys' fees and costs [Doc. 31 at 45-47]. All those claims and counterclaims are live before the Court.

On June 17, 2016 Novelis filed a Motion for Preliminary Injunction [Doc. 13]. On July 1, 2016 Smith filed a Response in Opposition [Doc. 19]. On July 8, 2016 Novelis filed a Reply [Doc. 21]. On July 20, 2016 Smith filed a Motion for Leave to File a Surreply [Doc. 24] with attached Surreply [Doc. 24-1]. On July 26, 2016 Novelis filed a Response in Opposition [Doc. 26].

On September 2, 2016 the Court issued an Order on then-pending Motions [Doc. 28]. In the Order, the Court noted that Novelis' Reply [Doc. 21] improperly raised for the first time the argument that Ma'aden was an affiliate of Alcoa, Inc. [Doc. 28 at 7]. Despite this improperly raised argument, the Court granted Smith's Motion for Leave to File Surreply [Doc. 24], and noted that it would consider the affiliate argument from Novelis' Reply [Doc. 21], Smith's Surreply [Doc. 24-1], and Novelis' Response in Opposition to the Motion for Leave to File Surreply [Doc. 26] in deciding the Motion

for Preliminary Injunction [Doc. 28 at 7]. The Court's Order also allowed Novelis to seek expedited discovery regarding:

- All communications concerning Ma'aden's recruitment and hiring of Smith;
- All communications concerning the scope of Smith's employment at Ma'aden;
- All communication with Novelis customers, employees, or representatives relating to subjects in the Non-Compete Agreement; and
- Copies of all electronically stored information removed from Novelis since December 1, 2015

[Id. at 11-14]. Smith was to provide that information within 14 days [Id. at 14]. The Court also granted a request by Novelis for Smith to preserve evidence [Id.]. In light of its decision to allow Novelis expedited discovery, the Court deferred ruling on Novelis' Motion for Preliminary Injunction [Doc. 13], and ordered Novelis to file any Surreply based on the discovery within 21 days, and Smith to file any Response to Novelis' Surreply within seven days after Novelis' Surreply was filed [Doc. 28 at 14]. Smith's Surreply [Doc. 24-1] was filed September 9, 2016 [Doc. 29].

On September 23, 2016 Novelis filed its Surreply [Doc. 34]. On September 30, 2016 Smith filed his Response [Doc. 35].

On December 19, 2016 the Court issued an Order finding that after reviewing the Motions, Responses, and Replies before the Court, an evidentiary hearing on Novelis' Motion for Preliminary Injunction [Doc. 13] was appropriate [Doc. 50 at 1]. An evidentiary hearing was thus set for January 31, 2017, and the Court deferred ruling on

3

Novelis' Motion for Preliminary Injunction [Doc. 13] until after the hearing [Doc. 50 at 1].

At the hearing, the Court heard sworn testimony on behalf of Novelis from Thomas Boney, Novelis' Vice President of Operations for North America [Doc. 58 at 22-75], and from Defendant Chris Smith on his own behalf [id. at 75-138]. At the end of the hearing, the Court directed the parties to file Proposed Findings of Fact and Conclusions of Law [Id. at 143-45, 157]. On February 14, 2017 Smith [Doc. 59] and Novelis [Doc. 60] both filed Proposed Findings of Fact and Conclusions of Law. Accordingly, this Motion is now ripe for decision before the Court.

## II.  Discussion

### A.  Findings of Fact

The Court now makes the following findings of fact. Plaintiff Novelis Corporation is headquartered in Atlanta, Georgia, has a research facility in Kennesaw, Georgia, and a recycling plant in Greensboro, Georgia [Doc. 58 at 24-25]. Novelis has more than 500 employees in the state of Georgia [Id. at 25]. Novelis is an industry leader in the production, marketing and sale of rolled aluminum products and aluminum recycling [Id. at 25-27]. Novelis' business involves recycling, manufacturing, and supplying rolled aluminum products to customers around the world for use in beverage can, automotive, and other applications [Id.]. Novelis has assets and customers in North America, South America, Asia, and Europe [Id. at 26-28, 38]. Some of Novelis' business is more regional in nature with Novelis shipping from its facilities in a particular region to customers within that region [Id. at 25-26]. Other segments of Novelis' business involve inter-regional shipments [Id.].

4

Novelis' Oswego, New York Plant makes rolled aluminum sheet for both beverage can and automotive uses [Id. at 33]. In response to 2009 federal regulations which sought to increase fuel efficiency in automobiles, Novelis invested approximately $400 million dollars into the Oswego Plant [Id. at 30, 33-35]. Much of that money was invested into creating continuous annealing solution heat (CASH) treat lines, which improved Novelis' ability to produce aluminum sheet to meet the evolving needs of the automotive industry [Id. at 33-35]. Novelis' Oswego Plant uses several proprietary processes, including on the CASH lines, to create a rolled aluminum sheet product [Id. at 35-37].

Smith was a Novelis employee for 30 years until his resignation at the end of April 2016 [Docs. 10-1 ¶¶ 3,6, 13-3 ¶ 5]. From March 2013 to April 2016, Smith served as the Plant Manager of Novelis' Oswego Plant [Doc. 13-3 ¶ 5]. As Oswego Plant Manager, Smith had significant interactions, and developed significant relationships, with customers and vendors [Doc. 58 at 57-59]. Smith also had familiarity with the construction and use of the three CASH lines at Oswego, including confidential processes developed through trial and error [Id. at 91-93]. Additionally, Smith gained familiarity with can sheet manufacturing, including proprietary processes, while working as Oswego Plant Manager [Id. at 35-38].

In October 2014 Smith entered into a Non-Competition, Non-Solicitation & Confidentiality Agreement ("Non-Compete Agreement") with Novelis [Doc. 16-1]. The Non-Compete Agreement states that Smith "has been and will be provided, and will have access to, some or all of Novelis's Trade Secrets and Confidential Information" concerning the production, marketing, and sale of rolled aluminum products and the recycling of aluminum [Id. at 2, 5]. The Non-

5

Compete also states that Smith "has had and will have access to Novelis customers and prospective customers" [Id. at 2]. Thus, "it would be impossible for [Smith] to perform similar duties for another company engaged in the same or similar business as Novelis" without using the confidential information--including client information--or trade secrets gained during Smith's time at Novelis [Id. at 2, 4].

About the same time Smith signed the Non-Compete Agreement, he entered into a Retention Incentive Agreement with Novelis [Doc. 16-2]. Under the Retention Incentive Agreement, Smith was entitled to payments totaling $75,000 over a two year period, provided that he continue to work for Novelis for three years [Id.].

In consideration of the facts stated in the Non-Compete Agreement and the Retention Incentive Agreement, and Smith's continued employment, Smith and Novelis agreed to the following restrictions on Smith's future employment:

a) During [Smith's] employment and for a period of twenty-four (24) months after [Smith's] separation from employment with Novelis for any reason, or, if applicable, for as long as [Smith] and/or Novelis otherwise may be obligated to maintain confidentiality, [Smith] will not disclose or make use of, directly or indirectly, for himself[] or others, any Confidential Information [Smith] obtains during the course of [his] employment with Novelis, with the exception of using the information in connection with [Smith's] efforts for Novelis; and

b) For a period of twenty-four (24) months after separation from employment with Novelis for any reason, [Smith] will not, directly or indirectly, perform similar duties of the type conducted, authorized, offered or provided by [Smith] for Novelis within twelve (12) months prior to [his] separation from employment with Novelis, whether performing those duties as an employee, consultant, independent contractor, agent or representative, for any Prohibited Business . . .; and

c) For a period of twenty-four (24) months after separation from employment with Novelis for any reason, [Smith] will not, directly or indirectly, call on, solicit or take away or attempt to call on, solicit or take away any customer of

6

Novelis with whom [Smith] had business-related contact within twelve (12) months prior to [his] separation from employment with Novelis, for the purpose of providing goods, services or information that are competitive with the Subject Business; and

d) For a period of twelve (12) months after separation from employment with Novelis for any reason, [Smith] will not, directly or indirectly, solicit any individual employed by Novelis to leave Novelis's employment

[Doc. 16-1 at 2-3].[1] The Non-Compete Agreement also notes that Smith must return all Novelis property when he leaves employment with Novelis [Id. at 3].

Prohibited Businesses are defined in the Non-Compete Agreement as:

any individual, partnership, corporation, limited liability company, joint venture, association, or other group, however organized, that competes with Novelis in the Subject Business. Prohibited Businesses include but are not limited to the following entities and each of their affiliates: Alcoa, Inc. (including but not limited to Alcoa Bohai Aluminum Industries Company Limited) . . . .

[Id. at 5]. The Non-Compete Agreement notes that Smith can work for part of a Prohibited Business if it does not compete with Novelis' Subject Business unless the employment would inevitably lead to disclosure of Novelis' trade secrets or confidential information [Id.]. Subject Business is defined as "Novelis's production, marketing and sale of rolled aluminum products and the recycling of aluminum, and related research and development" [Id.].

Novelis takes precautions to protect its confidential information [Doc. 58 at 61-65 (citing Docs. 61-4, 61-5, 61-6)].

---

[1]For the purpose of clarity, the four covenants contained in the Non-Compete Agreement are referred to in this Order as, respectively, "non-disclosure covenant" (covenant a), "non-compete covenant" (covenant b), "customer non-solicitation covenant" (covenant c), and "employee non-solicitation covenant" (covenant d).

7

Those safeguards include non-disclosure agreements, physical security, and policies regarding physical security, use of information technologies and workplace security [Id.].

Saudi Arabian Mining Company is engaged in a joint venture with Alcoa, Inc. known as Ma'aden Aluminum Company ("Ma'aden") [Doc. 61-11 at 4 ¶ 6]. One part of Ma'aden is Ma'aden Rolling Company (hereinafter "Ma'aden Rolling") [Id.]. Alcoa and Ma'aden are connected on many levels. Alcoa owns 25.1 percent of the joint venture, including Ma'aden Rolling [Id.]. In addition to ownership, Alcoa and Ma'aden are connected through a shared business strategy-- at least regarding serving the North American can market--through technical support and staff Alcoa provides to Ma'aden, and through commercial sales opportunities Alcoa provides to Ma'aden [Doc. 58 at 89-90]. These connections are seen in Smith's employment contract with Ma'aden which contains the Alcoa name and logo [id. at 79-80 (citing Doc. 61-11 at 54-55)], and in the fact that Smith's hiring at Ma'aden involved Alcoa representatives [id. at 81-82].

Like Novelis, Ma'aden Rolling produces rolled aluminum for use in cans and automobiles [Id. at 76]. Alcoa currently has plans to supply the North American can market from the Ma'aden Rolling Mill in Saudi Arabia, which Smith now oversees [Id. at 85-87]. Ma'aden is also seeking to expand its production in the global automotive market, including for at least one current Novelis customer [Id. at 90].

Smith is currently employed by Ma'aden as President of Ma'aden Rolling [Id. at 76, 79-80 (citing Doc. 61-11 at 54-55)]. Smith's current duties at Ma'aden Rolling are quite similar to those he

8

performed as manager of Novelis' Oswego Plant [Id. at 78-79 (citing Doc. 61-11 at 39-45)]. Among those similarities:

- Smith was responsible for producing can sheet that met quality standards and customer specifications at Novelis; he is responsible for the same thing at Ma'aden Rolling

- Smith was aware of the terms of Novelis' commercial can contracts as they related to production specifications; the same is true of his position at Ma'aden Rolling

- Smith was responsible for managing the product qualification process for Novelis in Oswego; he is responsible for the same thing in relation to Ma'aden Rolling's attempt to expand its production for the automotive industry

- Smith was responsible for managing production processes at Oswego, and is responsible for managing production processes at Ma'aden Rolling

[Id. at 86-93].

When Smith was hired by Ma'aden, Ma'aden agreed to provide Smith with protection should Novelis enforce its Non-Compete Agreement against Smith [Id. at 100-01 (citing Doc. 61-11 at 33-34)]. This protection came in the form of a Side Agreement memorialized in a letter between the then-Chairman of Ma'aden Rolling and Smith [Id. at 81-82, 100-01 (citing Doc. 61-11 at 33-34)]. Specifically, Ma'aden agreed that if Novelis' Non-Compete Agreement were to be enforced, Ma'aden would transfer Smith to a non-aluminum line of business for the duration of the non-compete period [Id. at 101-02]. Ma'aden would also honor Smith's base pay (though not bonuses) [Id. at 101-02, 104]. Finally, Ma'aden agreed to cover Smith's reasonable

9

expenses--including attorneys' fees--stemming directly from his acceptance of Ma'aden's employment offer [Id. at 103].

Ordinarily, Smith's Ma'aden Rolling responsibilities would include direct meetings with Ma'aden customers [Id. at 106]. Smith has refrained from such responsibilities because of the instant litigation, but the Ma'aden Rolling Vice President of Sales, who reports to and interacts with Smith, now interacts with the customers [Id. at 106-07].

### B.   Novelis' Motion for Preliminary Injunction

In its Motion for Preliminary Injunction, Novelis seeks an Order:

A. Enjoining and restraining Smith, preliminarily, for a period of twenty-four (24) months after the date of his separation from employment with Novelis, or if applicable, for as long as he and/or Novelis otherwise may be obligated to maintain confidentiality, from disclosing or making use of, directly or indirectly, for himself or others, any of Novelis' trade secrets or confidential information he obtained during the course of his employment with Novelis;

B. Enjoining and restraining Smith, preliminarily, for a period of twenty-four (24) months after the date of his separation from employment with Novelis, from directly or indirectly performing similar duties of the type conducted, authorized, offered or provided by Smith for Novelis within twelve (12) months prior to his separation from employment with Novelis, whether performing those duties as an employee, consultant, independent contractor, agent or representative, for any individual, partnership, corporation, limited liability company, joint venture, association, or other group, however organized, that competes with Novelis in the production, marketing and sale of rolled aluminum products and the recycling of aluminum, and related research and development, including but not limited to Ma'aden Aluminum Company;

C. Enjoining and restraining Smith, preliminarily, for a period of twenty-four (24) months after the date of his separation from employment with Novelis, from directly or indirectly calling on, soliciting or taking away or attempting to call on, solicit or take away any customer of Novelis with whom Smith had business-related contact within twelve (12) months prior to his separation from employment with Novelis, for the purpose of providing goods, services

10

or information that are competitive with Novelis's
production, marketing and sale of rolled aluminum products
and the recycling of aluminum, and related research and
development;

D. Enjoining and restraining Smith, preliminarily, for a
period of twelve (12) months after the date of his
separation from employment with Novelis, from directly or
indirectly, soliciting any individual employed by Novelis
to leave Novelis's employment;

E. Enjoining and restraining Smith, preliminarily, from
interfering with the contractual and advantageous business
relationships between and among Novelis and its customers;

F. Enjoining Smith, preliminarily, from disparaging or
defaming Novelis;

G. Ordering Smith to return any Novelis property in his
possession or control, including but not limited to
Novelis' trade secrets and confidential information;

H. Awarding Novelis costs, expenses, and attorneys' fees
incurred in connection with bringing and maintaining this
Motion, to the extent permitted by law and equity; and

I. Granting Novelis such additional relief as this Court
deems just and equitable

[Doc. 13 at 2-4].

### C.  **Legal Standard**

To obtain a preliminary injunction, the movant must demonstrate:

(1) a substantial likelihood of success on the merits; (2) that it

will suffer irreparable injury unless the injunction is issued; (3)

that the threatened injury outweighs possible harm the injunction may

cause to the opposing party; and (4) that the injunction would not

disserve the public interest.  Burk v. Augusta-Richmond Cty., 365

F.3d 1247, 1262-63 (11th Cir. 2004).  "[A] preliminary injunction is

an extraordinary and drastic remedy that should not be granted unless

the movant clearly carries its burden of persuasion on each of these

prerequisites."  Suntrust Bank v. Houghton Mifflin Co., 252 F.3d

1165, 1166 (11th Cir. 2001) (per curiam).  As the party requesting

11

the preliminary injunction, Novelis carries the burden to demonstrate each requirement for a preliminary injunction. GeorgiaCarry.org, Inc. v. U.S. Army Corps of Eng'rs, 788 F.3d 1318, 1322 (11th Cir. 2015).

Here, Novelis seeks a preliminary injunction based in part upon Smith's alleged breach of the Non-Compete Agreement [Doc. 13-1 at 12-22]. To merit a preliminary injunction against Smith, Novelis must thus show a likelihood of prevailing against Smith on the breach of contract claim based upon the Non-Compete Agreement, irreparable harm if the injunction is not issued, that the harm threatened outweighs the harm to Smith from the injunction, and that an injunction is in the public interest. To have a claim for breach of contract under Georgia law,[2] there must be: 1) a breach, 2) damages from the breach, and 3) the damages must be to a party with the right to complain about the breach. Bates v. JPMorgan Chase Bank, NA, 768 F.3d 1126, 1130 (11th Cir. 2014) (citing Norton v. Budget Rent A Car Sys., Inc., 307 Ga. App. 501 (Ga. Ct. App. 2010)). The breach complained of "must be more than de minimus and substantial compliance with the terms of the contract is all that the law requires." Kuritzky v. Emory Univ., 294 Ga. App. 370, 371 (Ga. Ct. App. 2008).

### D. **Conclusions of Law**

The Court now makes the following Conclusions of Law. Novelis has met its burden regarding all four elements required for a preliminary injunction.

---

[2]The Non-Compete Agreement here is governed by Georgia law [Doc. 16-1 at 5].

## 1. **Likelihood of Prevailing on the Merits**

First, Novelis meets its burden in regards to its likelihood of prevailing on the merits.

Smith argues that while the non-disclosure, employee non-solicitation, and customer non-solicitation covenants are enforceable, he has not violated them, so Novelis is not likely to succeed on its breach of contract claim against him in relation to these covenants [Doc. 59 ¶¶ 5-14]. Even assuming *arguendo* that Smith is correct regarding the employee non-solicitation covenant, his argument is unavailing in relation to the non-disclosure and customer non-solicitation covenants because he violated the terms of the Non-Compete Agreement, and thus breached the contract. The Non-Compete Agreement indicates that "it would be impossible for [Smith] to perform similar duties for another company engaged in the same or similar business as Novelis" without using the confidential information--including client information--or trade secrets gained during Smith's time at Novelis [Doc. 16-1 at 2, 4]. Smith's work at Ma'aden Rolling involves similar duties to his Novelis work for a company engaged in the same business as Novelis. Thus, Smith has violated the non-disclosure covenant. The customer non-solicitation covenant prohibits Smith from directly or indirectly soliciting customers of Novelis with whom he had business contact within his last 12 months at Novelis [Id. at 3]. While Smith has not directly interacted with customers at Ma'aden Rolling, an employee who reports to him has. Thus, Smith has violated the customer non-solicitation covenant.

13

Smith also argues that the non-compete covenant is not reasonable as to geography and the covenant does not apply to Ma'aden Rolling, so the covenant is unenforceable, and Novelis is unlikely to prevail on its breach of contract claim against him [Doc. 59 ¶¶ 15-64]. This argument is also unavailing.

Under Georgia law, restrictive covenants are permitted "so long as [they] are reasonable in time, geographic area, and scope of prohibited activities." Ga. Code Ann. § 13-8-53(a). Only geographic reasonableness is at issue here.

> A geographic territory which includes the areas in which the employer does business at any time during the parties' relationship . . . is reasonable provided that:
>
> (A) The total distance encompassed by the provisions of the covenant also is reasonable;
>
> (B) The agreement contains a list of particular competitors as prohibited employers for a limited period of time . . .; or
>
> (C) Both subparagraphs (A) and (B) of this paragraph.

Ga. Code Ann. § 13-8-56(2).

Defendant Smith argues that the non-compete covenant here is geographically "unreasonable and unenforceable" based on the holding in LifeBrite Laboratories, LLC v. Cooksey, No. 1:15-CV-4309-TWT, 2016 WL 7840217 (N.D.Ga. 2016) (Thrash, J.) [Doc. 59 ¶¶ 26-28]. Because the non-compete agreement is, *inter alia*, geographically unreasonable, he claims Novelis cannot show it is likely to succeed on the merits on its breach of contract claim in relation to this covenant [Id. ¶ 64]. The Court, however, finds LifeBrite distinguishable from the case at bar.

In LifeBrite, medical laboratory testing company LifeBrite employed sales representative Cooksey. LifeBrite, 2016 WL 7840217,

14

at *1. The employment agreement between the parties contained a non-compete covenant, which read:

> For as long as she is employed and for a period of one (1) year thereafter, employee shall not participate, directly or indirectly, as an owner, employee, consultant, office management position, in any proprietorship, corporation, partnership, limited liability company or other entity, engaged in any laboratory testing that is being sold by employee on behalf of company.

Id. at *2. Cooksey began working for another laboratory testing company within the one year restriction period. The LifeBrite court found the non-compete covenant's lack of geographic restriction, which technically prohibited Cooksey from working for any competitor anywhere in the world, "clearly unreasonable under [Ga. Code Ann. 13-8-53(a)], rendering the [non-compete covenant] void and unenforceable." Id. at *5. On that basis, the LifeBrite court denied LifeBrite's claim for injunctive relief. Id. at *7.

While LifeBrite appears analogous to the instant case because it contains a non-compete covenant with no geographic restriction, there is one major difference between the two situations. LifeBrite's business appears to have been regional at most; Cooksey's sales for LifeBrite involved a total of three clinics--two in Tennessee and one in Mississippi. Id. at *2, LifeBrite Laboratories, LLC v. Nina H. Cooksey, 1:15-CV-4309-TWT Docs. 41-2 ¶ 2, 60-3 ¶ 32 (N.D. Ga.). For a local or regional business such as LifeBrite to restrict a former employee from working for any competitor anywhere in the world would be patently unreasonable.

Novelis, however, is not a local or regional business. Novelis' business is global, involving customers and facilities located across the globe, and sales within and between four global regions. Thus, a global restriction is arguably reasonable here, meeting subsection

15

A of Ga. Code Ann. § 13-8-56(2). However, even if subsection A was not met, the Non-Compete Agreement included a list of particular competitors as Prohibited Businesses, and restricted Smith from working for them for a limited period of time, thus meeting subsection B of the standard [Doc. 16-1 at 3, 5]. Under the Non-Compete Agreement, Prohibited Businesses "include but are not limited to the following entities and each of their affiliates: Alcoa Inc. . . . ." [Id. at 5].

While neither Ma'aden nor Ma'aden Rolling appear on the list of Prohibited Businesses, with its many connections to Alcoa detailed above, Ma'aden is an affiliate of Alcoa, Inc. under a common sense definition of the term affiliate. See, e.g., Affiliate, Webster's New World Dictionary and Thesaurus (1996) (defining affiliate, in part, as "to associate (oneself) with a group, etc."), Affiliate, Black's Law Dictionary Fourth Pocket Edition (2011) (defining affiliate as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation."). The non-compete covenant is thus both reasonable in geographic scope and applies to Ma'aden Rolling. Further, Smith violated the non-compete covenant by going to work for Ma'aden Rolling.

Because all four covenants are enforceable, and Smith has violated at least three of them, Novelis has shown a breach of the Non-Compete Agreement. That breach was certainly more than *de minimis*, and the breach impacted Novelis' competitive advantage. Finally, as a party to the Non-Compete Agreement, Novelis is entitled to complain about the breach. For these reasons, the Court finds

that Novelis has met its burden with respect to its likelihood of prevailing on its breach of contract claims.

## 2. **Irreparable Harm**

Novelis also meets its burden with respect to showing irreparable harm if the injunction is not issued. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987) (citing Cate v. Oldham, 7070 F.2d 1176, 1189 (11th Cir. 1983).

Here, Novelis seeks to enjoin Smith from sharing Novelis' trade secrets and confidential information with a Novelis competitor, and from helping that competitor recruit Novelis' customers and employees. If the injunction were not to issue, Smith would be able to use his strategic knowledge of Novelis' business, customers, and employees to help Ma'aden Rolling achieve a competitive edge over Novelis. Once Smith shares his insider knowledge developed at Novelis with competitor Ma'aden Rolling, that knowledge cannot be taken away, and the competitive edge that knowledge would give Ma'aden would irreparably harm Novelis' business. See Ferrellgas Partners, L.P. v. Barrow, 143 F. App'x 180, 190 (11th Cir. 2005) (citing Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998)) (noting that loss of trade is a ground for showing the irreparable harm necessary for a preliminary injunction to issue). Further, no amount of money could compensate for the loss of competitive edge Novelis would experience.

## 3. **Weighing the Harms**

Novelis also meets its burden to show that the harm if the injunction is not issued outweighs the harm to Smith of issuing the injunction. As noted above, if the injunction is not issued, Novelis

17

stands to lose its trade secrets, customer relationships, and ultimately, its competitive edge. This is a substantial harm to Novelis.

If the injunction issues, on the other hand, Smith will be forced to work for another division of Ma'aden which does not compete with Novelis, or seek employment with a non-Prohibited Business during the injunction period. This harm to Smith is not insignificant, especially given his relocation to Saudi Arabia to take the Ma'aden Rolling job, his thirty years of experience in the aluminum industry, and the possible loss of his bonus pay.

Those potential harms, however, have been significantly reduced by Ma'aden's Side Agreement with Smith. As a result of the Ma'aden-Smith Side Agreement, if the Court enforces Novelis' Non-Compete Agreement against Smith, Smith will continue to have employment at Ma'aden, albeit not in the aluminum industry. Further, even if Smith is transferred to another position at Ma'aden, he will suffer no reduction in his base pay. Finally, Ma'aden will cover Smith's reasonable costs--including the attorneys' fees in the instant litigation--stemming from Smith's acceptance of the Ma'aden position. As a result of the Ma'aden-Smith Side Agreement, the harm to Novelis from not issuing the injunction substantially outweighs the harm to Smith from issuing the injunction.

### 4. **Public Interest**

Novelis also meets its burden to show that the injunction sought here is in the public interest. Georgia favors enforcing reasonable restrictive covenants. "[R]easonable restrictive covenants . . . serve the legitimate purpose of protecting legitimate business interests and creating an environment that is favorable to attracting

commercial enterprises to Georgia and keeping existing businesses within the state." Ga. Code Ann. § 13-8-50. Legitimate business interests include *inter alia* trade secrets, confidential information, substantial relationships with customers and vendors, good will, and specialized training. Ga. Code Ann. § 13-8-51(9). The covenants in the Non-Compete Agreement here are reasonable. Further, Novelis sought to protect its legitimate business interests through the Non-Compete Agreement. Finally, Novelis is headquartered in Georgia, has significant investments in Georgia, and employs a substantial number of people in Georgia. Public policy thus favors granting the injunction requested here.

Because Novelis has met its burden with respect to each element for granting a preliminary injunction, the Court finds that a preliminary injunction should be GRANTED as to items A-G of Novelis' Motion for Preliminary Injunction [Doc. 13 at 2-4]. Further, because the Court can grant that relief on the basis of Smith's breach of contract, the Court need not reach the issue of Smith's alleged misappropriation of trade secrets.

The Court finds, however, that attorneys' fees and costs are not warranted in this matter. In Georgia, costs are generally not allowed as damages. Ga. Code Ann. § 13-6-11. They may be allowed, however, where the plaintiff has requested and specially pled them, and "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense." Id. Here, the Court finds no circumstances warranting an award of expenses of litigation. Accordingly, item I of Novelis' Motion for Preliminary Injunction [Doc. 13 at 4] is DENIED. Thus,

19

Novelis' Motion for Preliminary Injunction [Doc. 13] is GRANTED IN PART, and DENIED IN PART.

## III. **Conclusion**

For the reasons stated above, Plaintiff Novelis' Motion for Preliminary Injunction [Doc. 13] is GRANTED IN PART, and DENIED IN PART. Specifically, the Motion is DENIED as to attorneys' fees and expenses, and GRANTED as to all remaining requests.

Accordingly, the following is hereby ORDERED:

A. Smith is enjoined and restrained, preliminarily, for a period of twenty-four (24) months after the date of his separation from employment with Novelis from disclosing or making use of, directly or indirectly, for himself or others, any of Novelis' trade secrets or confidential information he obtained during the course of his employment with Novelis;

B. Smith is enjoined and restrained, preliminarily, for a period of twenty-four (24) months after the date of his separation from employment with Novelis, from directly or indirectly performing similar duties of the type conducted, authorized, offered or provided by Smith for Novelis within twelve (12) months prior to his separation from employment with Novelis, whether performing those duties as an employee, consultant, independent contractor, agent or representative, for any individual, partnership, corporation, limited liability company, joint venture,

association, or other group, however organized, that competes with Novelis in the production, marketing and sale of rolled aluminum products and the recycling of aluminum, and related research and development, including but not limited to Ma'aden Aluminum Company and its affiliates;

C. Smith is enjoined and restrained, preliminarily, for a period of twenty-four (24) months after the date of his separation from employment with Novelis, from directly or indirectly calling on, soliciting or taking away or attempting to call on, solicit or take away any customer of Novelis with whom Smith had business-related contact within twelve (12) months prior to his separation from employment with Novelis, for the purpose of providing goods, services or information that are competitive with Novelis' production, marketing and sale of rolled aluminum products and the recycling of aluminum, and related research and development;

D. Smith is enjoined and restrained, preliminarily, for a period of twelve (12) months after the date of his separation from employment with Novelis, from directly or indirectly, soliciting any individual employed by Novelis to leave Novelis' employment;

E. Smith is enjoined and restrained, preliminarily, from interfering with the contractual and advantageous business relationships between and among Novelis and its customers;

F. Smith is enjoined, preliminarily, from disparaging or defaming Novelis;

G. Smith is ordered to return any Novelis property in his possession or control, including but not limited to Novelis' trade secrets and confidential information.

SO ORDERED, this ___ day of March, 2017.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE